

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| ALBERT THEODORE BOLINGER AND PEGGY LOUISE BOLINGER, | ) ) ) |
| | )   WD78832 |
| Respondents, | ) |
| | )   OPINION FILED:  April 12, 2016 |
| v. | ) |
| | ) |
| CLARKS FORK MUTUAL INSURANCE COMPANY, | ) ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Moniteau County, Missouri**
The Honorable Donald L. Barnes, Judge

Before Division One:  Lisa White Hardwick, Presiding Judge, Victor C. Howard, Judge
and Gary D. Witt, Judge

Appellant Clarks Fork Mutual Insurance Company ("Clarks Fork") appeals from summary judgment entered in favor of Respondents Albert and Peggy Bolinger (collectively the "Bolingers") on their petition alleging breach of an insurance contract. Clarks Fork insured a farm owned by the Bolingers on which three turkey barns were located.  The Bolingers allege that Clarks Fork breached their contract by refusing payment on that policy when two of the turkey barns collapsed due to weight of snow and ice.  Clarks Fork denied coverage, claiming the policy did not cover damage caused by

weight of snow and ice.  We find that material facts are in dispute and thus the Bolingers were not entitled to judgment as a matter of law.  We reverse and remand for further proceedings.

## Factual and Procedural History[1]

On Friday, February 22, 2013, at approximately 5:00 p.m., Albert Bolinger visited the office of Ken Wolken ("Wolken") of Wolken Insurance LLC to request a quote for insuring his property, which included his residence and several farm buildings.  Bolinger was moving his insurance coverage from another carrier.  It is uncontroverted that Albert Bolinger specifically requested that his three turkey barns (collectively "Turkey Barns") be insured against the peril of weight of ice, snow, or sleet.  The Turkey Barns were approximately 25 years old.  At the end of the meeting, Wolken instructed Albert Bolinger to return on the next business day to get an insurance quote.

On Monday, February 25, 2013, Albert Bolinger returned to Wolken's office and was told that the premium for the coverage for his home, farm, and Turkey Barns would be a total of $1,770.22, which he paid before leaving the office.

Clarks Fork alleges that Bolinger, at the same time, was also given an insurance quote through Clarks Fork ("Quote Proposal").  The Quote Proposal, under each of the headings "Outbuilding #1," "Outbuilding #2," and "Outbuilding #3," (the Turkey Barns) stated:

---

[1] "When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered."  *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).  Within this opinion, we have indicated which facts are disputed between the parties.  The facts set forth within the statement of facts are undisputed unless otherwise indicated.

2

Underwriting: FO-323 Weight of Ice, Snow, or Sleet coverage on farm outbuildings is not in effect until inspected and approved.

The premium amount the Bolingers paid included premium amounts for the FO-323 endorsement for all three Turkey Barns.

Clarks Fork also alleges that Wolken verbally informed Albert Bolinger that coverage for the peril of weight of ice, snow, or sleet for the Turkey Barns required an additional specific endorsement, FO-323, that would not be effective until after the Turkey Barns were inspected by Clarks Fork. The Bolingers deny that they received the written Quote Proposal or were told by Wolken that the barns were not covered for damage due to snow, sleet, or ice until after they submitted a claim for the collapse of the barns. These are therefore disputed facts for purposes of summary judgment.

After Bolinger left the office, Wolken submitted an application for insurance to Clarks Fork ("Application"). At the time Albert Bolinger paid the insurance premium, snow had begun to fall from an impending winter snow storm.

Although the Application was submitted and the premium paid, Clarks Fork did not issue Preferred Mutual Package Policy Number PM2616 ("Policy") to the Bolingers until March 4, 2013. The Policy's effective dates were backdated to 12:01 A.M. on February 25, 2013 (the date the premium was paid), until February 25, 2014. The Policy did not contain the FO-323 endorsement for any of the Turkey Barns. The Policy did specify that a premium was charged for each individual Turkey Barn; Turkey Barn #1, size 50 * 320, $100,000 limit, premium $640.00, Turkey Barn #2, size 50 * 320,

3

$100,000 limit, premium $640.00, Turkey Barn #3, size 50 *360, $100,000 limit, premium $704.00.

On February 26, 2013, the day after the Policy became effective, Turkey Barn One and Turkey Barn Two collapsed under the weight of snow and ice.[2] Albert Bolinger timely reported this loss to Wolken. The Turkey Barns had not been inspected prior to their collapse. There is no dispute that the barns were a total loss. Bolinger did not receive the written Policy until after the barns had collapsed and he had reported the loss to Wolken.

Clarks Fork denied coverage for the collapse of Turkey Barn One and Turkey Barn Two because loss due to weight of snow and ice was not a covered peril under the Policy in effect at the time of the peril. Clarks Fork returned the portion of the premium which it alleges is attributable to the FO-323 endorsement for all three Turkey Barns to the Bolingers, approximately $181. Although Turkey Barn Three had not collapsed, Clarks Fork returned the premium it alleges was for the FO-323 endorsement for that barn and never conducted an inspection. The total premium charged for coverage for all three Turkey Barns was $1,984. The Policy does not specify which portion of that premium was coverage for weight of snow and ice verses coverage for other perils.

The Bolingers filed their Petition for Damages against Clark Fork ("Petition") alleging one count for breach of contract. The Petition alleges that the two barns were

---

[2] There is no allegation or argument that Bolinger was aware that the Turkey Barns were in danger of collapsing at the time he purchased the Policy or that he was in any way acting in bad faith in purchasing this Policy.

4

covered by the Policy and Clarks Fork should have paid full coverage for both destroyed barns.

On May 5, 2015, the circuit court heard argument from both parties on cross-motions for summary judgment.[3] The court denied Clarks Fork's request for summary judgment and granted summary judgment in favor of the Bolingers in the amount of $200,000--the Policy limit for the two barns.[4]

This appeal followed.

## Standard of Review

This Court's review of summary judgment "is essentially *de novo*." *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Facts are viewed "in the light most favorable to the party against whom judgment was entered." *Id.* "The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id.*

## Discussion

## I.

Clarks Fork alleges five points of error on appeal. The first point contends that the circuit court erred in finding that the Policy contained coverage for the Turkey Barns in the event they were damaged as a result of the weight of ice, snow, or sleet.

---

[3] The transcript of this hearing is not part of the record on appeal.
[4] This amount failed to consider the amount of the deductable under the terms of the policy. However, neither party addresses this issue in the claims before this court.

5

The parties agree that Bolinger specifically requested coverage on the Turkey Barns for the peril of weight of snow and ice. They further agree the Policy was in effect at the time the Turkey Barns collapsed, that Bolinger had paid the entire premium requested by Clarks Fork for the Policy, and that Bolinger had not received the written Policy from Clarks Fork until after the collapse had occurred and a claim for coverage under the policy for the collapse had been made. They also agree that the Turkey Barns were covered by the Policy under "Coverage E." The sole issue to be decided by the circuit court was whether the Turkey Barns were covered against damage caused by the peril of weight of snow, sleet, or ice at the time of their collapse.

The declaration's page of the policy states that there is "COVERAGE E FARM BARNS AND OUTBUILDINGS" and specifically lists a machine shed and the three Turkey Barns and separate premiums for each. The declarations page also states that there is a "WINDSTORM OR HAIL DEDUCTIBLE ENDORSEMENT." The farm coverage listed in the Policy states:

PERILS SECTION -- COVERAGES E, F, AND G

"We" insure against direct physical loss to property covered under Coverages E, F, and G caused by the following perils, unless the loss is excluded under the General Exclusions:

The Perils Section then goes on to list certain perils covered by the Policy: "1. Fire or Lightening" and "2. Explosion." The Perils Section goes on to list additional "extended coverage," which is available if listed on the declarations page, for the perils of: "3. Windstorm or Hail," "4. Riot or Civil Commotion," "5. Aircraft," "6. Vehicles," "7. Smoke," "8. Theft," "9. Collison," and "10. Electrocution of Livestock." The Policy's

6

declarations page states that the Bolingers had an additional endorsement for extended coverage for the peril of "windstorm or hail."

Damage due to the weight of snow or ice is not mentioned in any fashion in any of the covered perils except under "Windstorm or Hail." The Policy states that loss "caused directly or indirectly by . . . ice (other than hail), snow, or sleet, all whether driven by wind or not" is not covered.

The next section of the Policy lists "General Exclusions" from coverage stating:

GENDERAL EXCLUSIONS -- COVERAGES E, F, and G

"We" do not pay for loss if one or more of the following exclusions apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

The General Exclusions then list a number of events: Business Interruption, Civil Authority, Earth Movement, Intentional Acts, Neglect, Nuclear Hazard, Ordinance or Law, Power Disruption, War, Water Damage, Wear and Tear, Weather Conditions, and Errors, Omissions, and Defects. Each General Exclusion states specific situations for which there is no coverage. Under "Weather Conditions" the exclusion states that the company will "not pay for loss which results from weather conditions that initiate, set in motion, or in any way contribute to losses excluded under the preceding General Exclusions." However, in the very next paragraph, the Policy provides that "**We do pay for an ensuing loss unless the ensuing loss itself is excluded**." (emphasis added)

We interpret the policy according to the plain and ordinary meaning of its language. *Mo. Emp'rs Mut. Ins. Co. v. Nichols*, 149 S.W.3d 617, 625 (Mo. App. W.D.

7

2004).  "If, giving the language used its plain and ordinary meaning, the intent of the parties is clear and unambiguous, we cannot resort to rules of construction to interpret the contract." *Mo. Pub. Entity Risk Mgmt. Funds v. S.M.*, 473 S.W.3d 161, 163 (Mo. App. W.D. 2015) quoting *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. App. W.D. 2011).  "Disagreement over the interpretation of the terms of a contract does not create an ambiguity." *Id.*

The Bolingers's argument, that the peril must be covered because it is not expressly excluded, is premised on the Policy being an "all-risk" policy.  "Under an all-risk insurance policy, recovery will be allowed for all fortuitous loss, unless the policy contains a specific provision expressly excluding the loss from coverage." *Pakmark Corp. v. Liberty Mut. Ins. Co.*, 943 S.W.2d 256, 259 (Mo. App. E.D. 1997).  The Policy purchased by the Bolingers was a "named peril" policy.  To recover on a named peril policy, the insured must prove the loss for which the insured seeks damages was caused by a peril insured against by the policy. *Franklin v. Farmers Mut. Ins. Co.*, 627 S.W.2d 110, 113-14 (Mo. App. W.D. 1982).

The Policy language states that it only covers loss due to specific perils--"Fire or Lightening" or "Explosions"--plus an additional endorsement to add the peril of "Windstorm or Hail."  Under the terms of the "Perils Section" of the Policy, the Policy does not provide coverage for loss due to the weight of snow and ice because it is not listed as a covered peril.  Normally, in a "named peril" policy, a non-covered peril does not need to be specifically listed as an exclusion because there is nothing that brings the peril under the terms of coverage of the Policy to begin with.  *See generally*, *Stufflebean*

8

*v. Fireman's Fund Ins. Co.*, 710 S.W.2d 931 (Mo. App. W.D. 1986) (flood due to rainwater was not a covered peril).

The Bolingers argue that this clear understanding becomes muddled when read in conjunction with the "General Exclusions" section, which immediately follows the "Perils Section." "Weather Conditions" are excluded from the policy by language stating:

> 12. **Weather Conditions** -- "We" do not pay for loss which results from weather conditions that initiate, set in motion, or in any way contribute to losses excluded under the preceding General Exclusions (Numbers 1 through 11).

> "We" do pay for an ensuing loss unless the ensuing loss itself is excluded.

We are to read the section as would an "ordinary person of average understanding." *Manner v. Schiermeier*, 393 S.W.3d 58, 65 (Mo. banc 2013). The Bolingers argue that the phrase: "'We' do pay for an ensuing loss unless the ensuing loss itself is excluded," may be fairly read by a person of average understanding to mean that Clarks Fork will pay for loss due to all weather conditions unless loss due to a particular weather condition is expressly excluded. To interpret the phrase in this manner renders it inconsistent with the terms of the "Perils Section." Most clearly, why purchase an additional wind and hail endorsement when it is already covered by this exception to the weather condition exception? Clarks Fork, however, offers no alternative interpretation of the phrase except to note that an exclusion provision of an insurance policy "has no function to endow coverage but rather limits the obligation of indemnity." *Transp. Indem. Co. v. Teter*, 575 S.W.2d 780, 784 (Mo. App. 1978); *Maritz Holdings, Inc. v. Fed. Ins. Co.*, 298 S.W.3d 92, 99 n.6 (Mo. App. E.D. 2009).

9

Although not a defined term in the Policy, "ensuing loss" is a technical term of art. Insurance policies may include "ensuing loss clauses" which "permit coverage for certain losses that flow from an excluded peril." Dave Snell, Lisa Simon, XL Re, *Ensuing Loss Clauses Provide Exception to Exclusion*, *in* 11 ANDREWS INS. COVERAGE LITIG. REP. 875 (2001). A broad ensuing loss clause "covers any loss occurring subsequent to an excluded loss as long as the subsequent loss is not excluded by the policy." *Id.* In this case, the phrase "'We' do pay for an ensuing loss unless the ensuing loss itself is excluded" may reasonably be read as a broad ensuing loss clause. If a weather condition causes a loss that, in turn, causes an additional, subsequent loss that would otherwise be covered under the Policy, the secondary loss remains covered.

"The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended." *Drury Co. v. Mo. United Sch. Ins. Counsel*, 455 S.W.3d 30, 36 (Mo. App. E.D. 2014). "We must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant." *Id.*

Although interpreting the phrase as an "ensuing loss clause" may be a usual and ordinary interpretation of the Policy, *Drury* makes clear that we are to interpret insurance contracts "consistent with the reasonable expectations and objectives of the parties" unless it is "obvious" that a technical meaning was intended. 455 S.W.3d at 36; *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463, 474 (Mo. App. E.D. 2013). "If a conflict arises between a technical definition of a term and the meaning

10

of the term which would reasonably be understood by the average lay person, the lay person's definition will be applied unless it is obvious the technical meaning was intended." *Cowin v. Shelter Mut. Ins. Co.*, 460 S.W.3d 76, 79 (Mo. App. W.D. 2015) (insured contested the policy definition of contractual term because it differed from its ordinary meaning).

Understanding that the term "ensuing loss" is a technical term of art within insurance contracts, we must then determine whether its technical meaning is inconsistent with the ordinary meaning and reasonable expectations of the parties. We find that the contested facts of this case preclude this Court from making such a determination. The Bolingers's interpretation of this phrase is colored by their belief that they purchased an insurance policy covering loss due to weight of snow and ice. Whether such an expectation was reasonable is dependent upon contested facts. While it is uncontested that the Bolingers requested and paid for such coverage, the Bolingers dispute Wolken's testimony that he informed Albert Bolinger that an inspection was needed prior to coverage. The Bolingers also dispute that they were given the Quote Proposal that stated the FO-323 endorsement was subject to inspection. The effect of the phrase: "'We' do pay for an ensuing loss unless the ensuing loss itself is excluded" cannot be determined until these material facts are decided by a fact finder.

We note that some of the facts upon which the Bolingers rely in order to argue the Policy covers loss due to weight of snow and ice are extra contractual and controverted. We further note that the petition in this case is not a model of clarity. Despite statements that the Bolingers are only relying on the four corners of the Policy, the Bolingers

11

repeatedly and emphatically insist that that the Policy must contain coverage for loss due to weight of snow and ice because the Bolingers specifically requested this coverage, paid for the coverage, and were never informed that this coverage required a prior inspection. They argue the Policy must be read to contain coverage for loss due to weight of snow and ice because that was the peril against which coverage was specifically requested and the coverage that they were informed they were purchasing. They also note that they were not provided a copy of the written policy until after the damage occurred and a claim was made for coverage. These are extra contractual theories involving material facts that are controverted.[5] Where there are controverted issues of material fact, summary judgment is precluded.

The circuit court erred in entering summary judgment in favor of the Bolingers because, at best, the coverage requested by the Bolingers is dependent on controverted material issues of fact that remain unresolved and preclude summary judgment.

## II.

Clark's Fork final point on appeal alleges that, in granting summary judgment to the Bolingers, the circuit court failed to address Clarks Fork's affirmative defenses of coverage exclusion under General Exclusions eleven, twelve, and thirteen of the Policy and estoppel and waiver defenses. We agree that these affirmative defenses were not properly addressed and, further, raise issues of controverted material fact that preclude summary judgment.

---

[5] We recognize that these are not theories that were clearly pled in the Petition. They are, however, the arguments upon which the Bolingers continually base their arguments as made clear in their motion for summary judgment and arguments on appeal. What, right, if any, the Bolingers have to amend their Petition to more clearly delineate these claims is an issue to be determined by the circuit court as "justice so requires." Rule 55.33.

A complete discussion of the affirmative defenses raised is not necessary except to note that the Bolingers had the burden of establishing "that the non-moving defending party's affirmative defense[s] fail as a matter of law." *Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 91 S.W.3d 655, 658-659 (Mo. App. W.D. 2002). The Bolingers fail to argue the propriety of the affirmative defenses. Their only challenge to the affirmative defenses is that it is uncontroverted that the loss was caused by the weight of ice and snow and, therefore, there is coverage regardless of any other exclusions. This ignores the plain language upon which they rely that there is coverage "unless the ensuing loss itself is excluded." Although it is uncontroverted that the loss was caused by the weight of ice and snow, the degree to which the loss was caused by wear and tear of the building *is* controverted and loss caused by wear and tear is specifically excluded as a General Exclusion. Thus, the Bolingers own interpretation of the Policy necessitates that the degree to which "wear and tear" played a role in the collapse must be determined prior to judgment.

The Bolingers failed to refute Clark's Forks affirmative defenses prior to the grant of summary judgment, and it is unclear that the circuit court actually properly considered such defenses in entering its judgment. Further, the Bolingers present no additional arguments regarding the affirmative defenses on appeal. Therefore, we find it unnecessary to address them further on this appeal. Instead, we merely note that they must be addressed in some fashion on remand of this case.

13

## III.

Clark's Fork's second and third points on appeal allege that summary judgment was not proper based on any extra contractual theories or oral contract theories because such theories were not properly pled. The Bolingers agree with these points and request that we limit our review to only the written terms of the contract. Thus, we need not address points two and three.

We also need not address Clark Fork's fourth point on appeal given our holding regarding point one.

## Conclusion

We find that there exist material controverted facts that preclude summary judgment. We further find that the Bolingers failed to properly refute Clarks Fork's affirmative defenses prior to the circuit court's grant of summary judgment. As such, we remand this case for further proceedings by the circuit court consistent with this opinion.

_____
Gary D. Witt, Judge

All concur